|  |  |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>UNITED STATES OF AMERICA,<br><br>-against-<br><br>CHOLO ABDI ABDULLAH,<br><br>Defendant. | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED:  _10/16/2024_<br><br>20 Cr. 677 (AT)<br><br>**<u>ORDER</u>** |

ANALISA TORRES, District Judge:

The Court has reviewed the Government's motions *in limine*. Mot., ECF No. 125. The Government's requests, and the Court's rulings, are as follows:

1. Admit records from Google LLC ("Google") and Meta Platforms, Inc. ("Meta") concerning Defendant, Cholo Abdi Abdullah, and his co-conspirators' online accounts as self-authenticating business records under Federal Rules of Evidence 803(6), 902(11), and 902(13): **GRANTED IN PART AND DENIED IN PART**;

2. Admit evidence of propaganda materials created by Harakat al-Shabaab al-Mujahideen ("al Shabaab") and viewed by Abdullah, in addition to video footage of the DusitD2 attack, under Federal Rule of Evidence 404(b): **GRANTED**;

3. Admit statements made by Abdullah's al Shabaab handler and other alleged al Shabaab members under Federal Rules of Evidence 801(d)(2)(E) and 804(b)(3): **GRANTED IN PART AND DENIED IN PART**; and

4. Take judicial notice of the U.S. State Department's designation of al Shabaab as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act: **GRANTED**.

The Court's decisions on the motions *in limine* are without prejudice to renewal at trial if an appropriate basis for the motion arises.

## DISCUSSION

I. <u>Self-Authenticating Records</u>

The Government moves to admit records from Google and Meta regarding Abdullah and his co-conspirators' online activity as self-authenticating business records under Federal Rules of

Evidence 803(6), 902(11), and 902(13). Mot. at 13–14. To begin, the Government must authenticate all records it introduces at trial by "produc[ing] evidence sufficient to support a finding that the [record] is what the [Government] claims it is." Fed. R. Evid. 901(a). Rule 803(6) further provides that records of a regularly conducted activity are "not excluded by the rule against hearsay" if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business . . . ;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Rule 902 in turn states that evidence is self-authenticating, meaning that it does not require "extrinsic evidence of authenticity in order to be admitted," if it is, *inter alia*, "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court," or "[a] record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) . . . ." Fed. R. Evid. 902(11), (13). In either case, the evidence's proponent must give the adverse party "reasonable written notice of the intent to offer the record" and "must make the record and certification available for inspection" before trial. *Id.*

The Government intends to introduce records it obtained from Google and Meta pursuant to grand jury subpoenas and search warrants. Mot. at 14. The records concern activity on Google and Facebook accounts allegedly used by Abdullah, his al Shabaab handler ("CC-1"),

2

and other alleged al Shabaab members with whom CC-1 communicated. *Id.* They contain online communications between the account users concerning various terrorist plots, including the plot at issue here, as well as emails, location data, and digital information used to confirm the user of each account. *Id.* The Government represents that the Google records it intends to offer are accompanied by a custodial records certification that was signed under penalty of perjury, and it is in the process of obtaining a corresponding certification for the Meta records. *Id.* at 16. According to the Government, this type of custodial certificate "set[s] forth the proper foundation for the admission of the records in question." *Id.*

The Second Circuit has explained that "[t]he type and quantum of evidence required" to authenticate a record is context-dependent and generally "related to the purpose for which the evidence is offered." *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014) (cleaned up). Here, the Government's purpose in offering the Google and Meta custodial certificates is unclear. To the extent that the Government intends to use the custodial certificates to introduce "self-authenticated" proof that Abdullah and other individuals owned and used the accounts shown in the records, its motion is denied. *See* Mot. at 14 (describing the records as consisting of "accounts *used by the defendant*" or "*used by CC-1*," "online communications between *the defendant*, *CC-1*, and *other co-conspirators*," and "emails from *the defendant's* Google accounts" (emphases added)). In *Vayner*, the Second Circuit stated that a printout of a defendant's social media profile page was not the type of "self-authenticating" record that could be admitted under Rule 902. 769 F.3d at 129 n.4, 131. This is because a data custodian employed by a social media company lacks "a sufficient basis on which to conclude that [a social media account] [i]s what the government claimed it to be—[the defendant's] profile page." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 488 (S.D.N.Y. 2015) (quoting *Vayner*, 769 F.3d at

3

131). In other words, "the mere existence of a webpage with the defendant's name and photograph d[oes] not 'permit a reasonable conclusion that th[e] page was created by the defendant or on his behalf.'" *Id.* (quoting *Vayner*, 769 F.3d at 132).

This is not to say that evidence from Google, Meta, and social media companies may never be admitted as self-authenticating business records. For example, metadata showing when a message was sent or information about a user's IP address are the types of records that could be self-authenticating. *See United States v. Hunt*, 534 F. Supp. 3d 233, 255 (E.D.N.Y. 2021). And of course, the Government may rely on the certifications of the Google and Meta records custodians as indicia that the records are indeed Google and Meta records of accounts, communications, location data, etc., that were not "subject to manipulation or inadvertent distortion." *United States v. Browne*, 834 F.3d 403, 414 (3d Cir. 2016). The point is that the Government may not "rely *solely* on certifications to authenticate and admit the *content*" and *ownership* of the accounts. *Hunt*, 534 F. Supp. 3d at 255. Should the Government wish to authenticate the contents of the records as evidence of Abdullah and his co-conspirators' accounts and activity, it will need to offer evidence showing that these particular individuals "created the [accounts] or [were] responsible for [their] contents" and activity. *Vayner*, 769 F.3d at 132. That may include evidence demonstrating similarities between the accounts' location data and Abdullah or his co-conspirators' travel history, the existence of identical cookie data shared by multiple accounts, *see* Mot. at 5, or statements by Abdullah that he created and maintained the relevant accounts, *see Browne*, 834 F.3d at 413–15.

To the extent the Government seeks to use the written declarations of Google and Meta employees to self-authenticate the relevant online accounts and associated activity as belonging to Abullah, CC-1, and other alleged al Shabaab members, its motion is DENIED. To the extent

4

the Government seeks to use the declarations to "authenticate and admit records *about* the content" of those accounts, for example, that the accounts exist (or did exist) and are associated with particular IP addresses, or metadata showing the times ands dates of online activity, its motion is GRANTED. *See Hunt*, 534 F. Supp. 3d at 255.

II.     Al Shabaab Propaganda and Video Footage

The Government also seeks to introduce evidence of al Shabaab propaganda and related video footage that Abdullah searched for and/or viewed online, including footage depicting the January 2019 terrorist attack on the DusitD2 hotel complex in Nairobi, Kenya, as direct evidence pursuant to Rule 404(b). Mot. at 17.

Rule 404(b) provides that, although "[e]vidence of any other crime, wrong, or act" is not admissible as character evidence, the evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" so long as the proponent provides the adverse party with notice of what evidence it intends to introduce and for what purpose. Rule 403, conversely, states that a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The Government seeks to use the al Shabaab propaganda and related video footage, all of which Abdullah allegedly searched for or viewed online, to prove that Abdullah "understood the nature of al Shabaab and its deadly tactics," knew that al Shabaab engages in "terrorist activity" specifically targeting U.S. citizens, and, with that understanding, took steps to support al Shabaab. Mot. at 22–26. The Government also intends to use the evidence to corroborate other evidence it will introduce at trial, including Abdullah's admission that he intended to assist a

5

terrorist organization and the contents of online communications between Abdullah and his alleged co-conspirators.  Mot. at 25, 27–28; *see also infra* Section III.

The Court agrees that the Government's proposed evidence is directly probative of Abdullah's crimes charged in Counts 1 and 2 of the indictment.  The propaganda material and related videos support a finding that Abdullah "knowingly provide[d] material support" to an organization that he knew "has engaged or engages in terrorist activity" or "terrorism."  18 U.S.C. § 2239B(a)(1); *see* Mot. at 22–24; *United States v. Kandic*, No. 17 Cr. 449, 2022 WL 1266431, at *5 (E.D.N.Y. Apr. 28, 2022) (noting that the Second Circuit "has regularly allowed terrorist propaganda to be admitted in material support cases").  The evidence also corroborates Abdullah's admission that he was associated with one of the DusitD2 attackers.  *See* Mot. at 27. And, having carefully reviewed the proffered documents and video footage, which may indeed be upsetting to some viewers, the Court concludes that the potential danger of unfair prejudice caused by the evidence is outweighed by its probative value.  *See United States v. Pugh*, 162 F. Supp. 3d 97, 117–18 (E.D.N.Y. 2016) ("Because this is a case about supporting terrorists, it is inescapable that there will be some evidence about violence and terrorist activity.  It cannot be denied that such evidence will be unfavorable to the defendant, but the court cannot conclude that it will be unduly prejudicial." (cleaned up)).

For these reasons, the Government's motion to admit the al Shabaab propaganda materials and related video footage is GRANTED.  At trial, the Government must connect the video footage—particularly any footage that the Government does not contend Abdullah personally viewed—to the charged conduct through proper contextualization.  The Government must also avoid repetition.  The Court will not tolerate the needless presentation of potentially prejudicial material.  If the risk of unfair prejudice arises, the Court will issue an appropriate

limiting instruction to the jury. *See United States v. Abu-Jihaad*, 630 F.3d 102, 134 & n.30 (2d Cir. 2010) (approving the use of limiting instructions to mitigate the risk of unfair prejudice).

### III.    CC-1 and al Shabaab Member Statements

Next, the Government moves to admit "a number of statements made by CC-1 and other al Shabaab members in furtherance of the charged conspiracies" as co-conspirator statements under Rule 801(d)(2)(E) and as statements against interest under Rule 804(b)(3). Mot. at 32.

#### A. Co-conspirator Statements

The Government first seeks to admit statements by Abdullah's "al Shabaab handler, CC-1, concerning the planning and execution" of the alleged hijacking plot "and al Shabaab's activities more generally." Mot. at 32. The Government argues that the statements are admissible under Federal Rule of Evidence 801(d)(2)(E), which provides that an out-of-court statement offered against an opposing party is not hearsay if the statement "was made by the party's [co-conspirator] during and in furtherance of the conspiracy."

For the Court to admit out-of-court statements under Rule 801(d)(2)(E), the Government must establish by a preponderance of the evidence that "a conspiracy existed, that the defendant and declarant were members, and that the statements were made during the course of and in furtherance of the conspiracy." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)). The Court may consider the statements to determine whether there is sufficient evidence to deem the declarant a co-conspirator. *Bourjaily v. United States*, 483 U.S. 171, 178–79 & n.2 (1987). The Court may also admit co-conspirator statements "on a conditional basis, subject to the later submission of the necessary evidence of th[e] four prerequisites." *Tracy*, 12 F.3d at 1199.

7

The Government intends to prove that Abdullah and CC-1 conspired to carry out an aircraft hijacking by introducing, "for example, directives, updates, and encouragement from CC-1, as well as check-ins and progress updates from [Abdullah]." Mot. at 39. "[A]s is the practice in this [C]ircuit," CC-1's statements to Abdullah "will be admitted in the Government's case 'subject to connection' and without the need for a pretrial hearing on the sufficiency of the evidence concerning . . . the alleged conspiracy." *United States v. Giovanelli*, 747 F. Supp. 875, 880 (S.D.N.Y. 1989) (citation omitted). The Government's motion to admit CC-1's statements to Abdullah is, therefore, GRANTED. The Court will make the required *Geaney* findings outside the presence of the jury at the close of the Government's case and, if necessary, give an appropriate limiting instruction. *See Tracy*, 12 F.3d at 1200.

B. Statements Against Interest

The Government also asks the Court to admit communications between CC-1 and other alleged al Shabaab operatives as statements against interest under Rule 804(b)(3). Mot. at 40. The Government contends that these communications are relevant to establishing that CC-1 "was in fact an operative of al Shabaab, engaged in coordinating the [a]viation [p]lot and other al Shabaab plots like it during the relevant time period." *Id.* To that end, the Government seeks to introduce conversations between CC-1 and CCs-2 and -3—al Shabaab operatives based in South Africa and Djibouti, respectively—concerning other plans to hijack aircraft, as well as messages between CC-1 and the DusitD2 participants leading up to the attack. *Id.* at 34–35.

Rule 804(b)(3) provides an exception to the rule against hearsay for statements made against the declarant's interest. For statements to be admissible under Rule 804(b)(3), the proponent must show by a preponderance of the evidence:

> (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable [person in the declarant's] position

8

would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement.

*United States v. Wexler*, 522 F.3d 194, 202 (2d. Cir. 2008) (cleaned up).

As to the first requirement, the Government contends that "[t]he declarants—CC-1, CC-2, CC-3, and other al Shabaab members—are plainly unavailable as witnesses for the Government." Mot. at 40. "Courts do assume a witness is unavailable where a witness justifiably fears being arrested in the United States." *United States v. Buck*, 271 F. Supp. 3d 619, 623 (S.D.N.Y. 2017) (cleaned up) (quoting *United States v. Pham*, No. 12 Cr. 423, 2015 WL 7871348, at *3 (S.D.N.Y. Dec. 4, 2015)). However, the Government proffers no facts—beyond the statements themselves—to establish that the declarants are unavailable to testify; indeed, the Government has not divulged the identities of the declarants to the Court. *See id.* at 623 (holding that proponent failed to show that "generically described" witnesses were "truly unavailable"). Without further information about the declarants' identities and suspected whereabouts, the Court cannot find that the Government is unable, "by process or other reasonable means," to procure their attendance or testimony. Fed. R. Evid. 804(a)(5)(B). On this basis alone, the Government's motion may be denied.

Even if the declarants were unavailable, the Court must also find that the offered statements of the declarant would be perceived by "a reasonable person in the declarant's shoes" to be "detrimental to his or her own penal interest." *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004), *supplemented*, 108 F. App'x 667. Each statement must be assessed individually. *Williamson v. United States*, 512 U.S. 594, 599–600 (1994). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context." *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007).

9

The Government offers several examples of statements that meet this bar. For example, the Government alleges that CC-3 was "tasked by CC-1 with testing security measures" at an English-language school in Djibouti and communicated with CC-1 about smuggling routes and airport security checks. *Id.* at 33–34 (quoting messages). These statements, which describe crimes that CCs-2 and -3 planned to carry out with CC-1's guidance, would expose the declarants to criminal liability and are therefore self-inculpatory. And, because the statements were made to alleged co-conspirators and do not attempt to "minimize [the declarants'] own culpability, shift blame onto [Abdullah], or curry favor with the authorities," they carry sufficient indicia of trustworthiness. *Williams*, 506 F.3d at 155.

The Government also seeks to offer communications between CC-1 and other al Shabaab operatives about the DusitD2 attack: specifically, about "procuring the types of chemicals used to manufacture the explosive," "using a suicide bomber as part of the attack" and "connect[ing] the DusitD2 suicide bomber with the other DusitD2 attackers," "conducting surveillance of American businesses" and maximizing American casualties, and, on the day of the attack, getting "updates about the progress of the operation." Mot. at 34–35. Such statements would similarly appear to implicate the declarants in serious crimes. However, the Government provides no specific examples of the statements it seeks to admit, and Rule 804(b)(3) "cannot be applied in the abstract." *United States v. Bankman-Fried*, No. 22 Cr. 673, 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023).

Other statements are not obviously self-inculpatory. The Government cites an exchange between CC-1 and CC-2 "a few weeks" after Abdullah was arrested in 2019, in which CC-2 wrote, "Does that news has [sic] any truth to it" and "F-E-A-R: has two meanings: Forget Everything And Run or Face Everything And Rise. The choice is yours." Mot. at 34. Several

10

days later, CC-1 wrote: "Very sorry dude, visiting soon and will explain why he was a stubid [sic] like that," to which CC-2 responded: "i am leaving time is not on my side, if it goes well you will know derling [sic]." *Id.*  The Government does not explain why these statements, which do not facially implicate CC-1 or CC-2 in any crimes, would be adverse to their penal interest.

Accordingly, the Government's motion to admit statements as against their declarants' interests is DENIED.

    IV.    <u>Judicial Notice of Terrorist Organization</u>

Finally, the Government requests that the Court take judicial notice of the designation of al Shabaab as an FTO under Section 219 of the Immigration and Nationality Act, an element of Counts One and Two of the Indictment.  Mot. at 41.  The Court may judicially notice a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The Federal Register is such a source.  *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed."); 73 Fed. Reg. 14,550 (Mar. 18, 2008) (State Department designation of al Shabaab as an FTO).  Accordingly, the Government's motion to take judicial notice is GRANTED.  At trial, the Government must introduce both Section 219 of the Immigration and Nationality Act and the portion of the Federal Register that designates al Shabaab as an FTO.

**CONCLUSION**

For the reasons stated above, the Government's motions *in limine* are GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 125.

SO ORDERED.

Dated: October 16, 2024
       New York, New York

                                          ANALISA TORRES
                                        United States District Judge